It's either StonCor or StoneCor Group versus Specialty Coatings. I am Charles Quinn and I am pleased to represent StonCor Group, Inc. in this matter. Armor, stone, stone, shield. Armor, stone, stone, shield. Armor, stone, stone, shield. Two marks having the same connotation used in the sale. These are so factual, though, these matters are. How would you advise this court to venture to change the expert opinion of the TTAB? This is their field. They're the ones that decide these facts. Why would we disturb their determination? Why would you disturb their determination? Yes. What is the lack of substantial evidence? First of all, there was plenty of substantial evidence and I'll be glad to address that on a point by point. But most importantly, most importantly to your Honor's question, the TTAB ventured far, far, far out of its legitimate realm of deciding cases when it concocted from thin air or somewhere else, I have no idea, a whole new rule as to how these trademarks, our client's trademarks, some of which have been around for 90 years, should be pronounced. The mark Stonehard was registered. Setting aside the pronunciation issue, which you're welcome to return to, but didn't the board, as I read it, really focus on similarity as a whole and they pointed out that the stone is different ends of the two marks, that they are in appearance very different, even if you pronounce it stone shield instead of stone shield, it looks different than armor. We agree. It has different numbers of letters and different appearance and the stone appears at different places and there's an E in one and there isn't in the other. Isn't that enough to support the TTAB's decision? Not in Stonecourt's view and this court has held that connotation similarity alone is sufficient to find a likelihood of confusion. Which case? If you're going to say Kenneth Parker, you want to be careful. That's the Plato-Fundo case. No, I'm not going to say that. Okay, very wise, because I think that turns primarily on the fame of the mark. I had that in my rebuttal notes, I thought that's where this would come up. In your brief you used Kenneth Parker for that proposition and I was prepared to pounce on it because I think it's a fame case, not a connotation case. The Hancock vs. American Steel and Wire, Cyclone vs. Tornado. Completely different spellings, completely different appearance, identical connotation, opposition sustained. Same goods, same as we have here. But isn't that a factual question for the board to decide about whether they have the same connotation or not? And here the board decided that they don't have the same connotation. But the board erred. The board started out with the wrong premise. The board said the way these goods or these marks are pronounced should be. Okay, I get you on that. And they pulled this rule out of. As the chief said, put aside the pronunciation thing. I'm not making up my mind but I think you have a very strong argument on the pronunciation thing. But even putting that aside, the board looked at other factors and said these don't have the same connotation. They don't look the same. They don't have the same commercial impression. Armor and shield aren't the same words. You'd have a stronger case if it had been stone shield and shield stone. But it's different. I agree. So where's the lack of substantial evidence? If this was de novo, it might be a completely different story. But it's not. Where's the lack of substantial evidence that armor stone and stone shield don't have the same connotation? The lack of substantial evidence. Our burden was to show that there was substantial evidence and we believe that we did. Well, that was your burden below. That was our burden. Your burden here is to show that the board's factual finding lacked substantial evidence. And our view is that the board erred by giving excess weight, if you will, to the appearance and sound and ignoring the connotation. Let me make sure. I think I understand what you're arguing. The connotation point. The pronunciation point so infects the board's analysis that if there's error there, there's error and it has to be sent back. It killed. Yes. They were so far off base. Where did they get this rule? Where did it come from? Well, I don't think they're giving us a rule. They're giving us a factual finding. And I think as Judge Hughes points out, they're entitled to make those factual findings unless they have somehow grossly misconstrued the record. And help me out here. Where's that? And I think that's exactly what they did. Your Honor, I think you cannot find a basis in the record for the rule that the board promulgated here that marks that start with S-T-O should be pronounced with a short O. As a matter of fact, the dictionary says exactly the opposite. Webster's New Collegiate says that where the letter O is used in a word, the preferable way to pronounce it is as a long O, namely O. The board had no evidentiary basis. There was no evidence for this new rule. That's where the board erred. And that's where this court needs to step in and say, board, you're way offline here. This company's trademarks have been in use for 90 years. The mark Stonehard will celebrate its 90th anniversary of registration next month. The other marks have been in use for 30 or 40 years. This company does a tremendous amount of business under those marks in this country. It is absurd to think that this company doesn't know how to pronounce its own marks. And there was plenty of testimony as to how the marks are pronounced. Specialty Codings conceded that that pronunciation was correct. The pronunciation wasn't an issue until the board came up with this crazy rule. And now our client is stuck with this decision, which, granted, it's not a presidential decision, but it is a published decision. It's available. And our client is going to have to deal with that rule unless this court, in its wisdom, overrules it. Our client's going to have to deal with that rule every time it goes to enforce one of its marks against a third party or oppose a third party mark. That's just plain wrong. The board had no business doing it. You cannot find any evidence. Not a single shred of evidence in the record that supports that finding. Can I say, do you do business outside this country? Our client? Yes. Yes, sir. In England, too? Yes. All over the world. And how is it pronounced in England? I'm thinking of scone and scone. It is pronounced stone. Our company's trade name is Stone Hard, Stone Shield, Stone Clad. We have a whole collection of those marks. Am I right that they – I'm sorry. Go ahead. I submit to you that the way the mark is pronounced by someone in Germany has nothing to do with the way it's pronounced here. I picked England. Or England. Our people are – we have a collection of captive sales representatives. These people go out every day and make face-to-face – Let me just ask you on the evidence. Is the material of 357 to 358 – I guess this is Mr. Jewell testifying. Yes. Is that the extent of your evidence about how the consumer class, the purchasing class, not how you pronounce it in your own internal conference rooms, but how the consumer class that the Lanham Act is aimed at, is that the extent of the evidence of how they pronounce this? Mr. Jewell's testimony is the testimony as to consumer pronunciation, but it is – it only stands to reason, it's common sense, that when a company coins its marks, what does it do? It goes out and teaches people how they are to be pronounced. That's what Stone Core has done over the years, and it's been very, very successful. Can you remind me, what is your evidence about how other companies in this line of work have named their products? I'm in my rebuttal times. Please proceed. How other companies have named their products? We did not present evidence about how other companies have named their products. We, Stone Core, names its products S-T-O-N, followed by the particular name for that particular product. And that's the way the company is recognized, the family of marks is recognized. It's been very successful. They install a million square feet of flooring a month. Anything descriptive here? With respect to armor stone, sure there is. With respect to stone, in use as a stone, faux stone covering for a floor. I'm sorry, Your Honor. With respect to the use of the term stone, when referring to a faux stone covering of a floor. Is that descriptive? Not with respect to these products, Your Honor. These are poured-in-place, epoxy-based floors that have multiple designs and colors. You see, you would have gained a little credibility with me if you would have said, yes, but we have secondary meaning. Well, we do have secondary meaning. That would have been the right way, I think, to address it. When it's a stone-appearing floor, I think to use the term stone is to be descriptive. Your response is secondary meaning, and that would be fine. It does have a secondary meaning. Moreover, the mark is incontestable. It's been in use and registered for 25 years, 30, I forget. I know I registered it, and I believe we recently renewed it. It is well-recognized. The stone marks are well-recognized. I'm sorry that I went into it all the time. No, thank you, Mr. Quinn. You're helping us, and we're going to restore your rebuttal time. Thank you very much. Fully. We'll need to give Mr. Seifert an extra three minutes, and we'll be all balanced in time. Thank you, Your Honor. Thank you, Mr. Quinn. If it pleases the Court, Matthew Seifert from the Appellee Specialty Company. The marked armor stone has gone through an examination at the trademark level. It was examined. It was registered. It's gone through a board proceeding, a decision, and then a request for reconsideration. The appellant's argument that the board somehow missed certain evidence or didn't consider the evidence. You've got almost identicality of the goods. You've got the same trade channels. You've got the same type of consumers, the same consumer core. There's an awful lot that's auguring in favor of protection here. How do you get by that? And add to that now, if you pronounce them identically, does that give you a problem? Both are stone marks, and you've got these other things in favor. Sure. No, and the board addressed that issue directly. That is only one factor in the DuPont analysis. The similarity of the marks is a principal factor, which the board considered. Took an objective analysis of the marks side by side. Found that Armistone used the grammatically correct version of stone, while there was no evidence that S-T-O-N would be pronounced as stone. Did you suggest that argument about the pronunciation to the boarders at their home? We did not suggest that argument with respect to the pronunciation of the word S-T-O-N. The board looked at the marks. Do you think it's right? I believe it's based on substantial evidence. If you look at words like Piston or Kingston. But is there anywhere in the record other than Mr. Jewell's testimony that gives us another pronunciation? I think Judge Toronto gave you some record evidence for pronunciation. Is there anything in the record going the other way? There is nothing in the record going the other way. It wasn't an issue. The board came to the conclusion, reading the marks, that they could be pronounced S-T-O-N. To Your Honor's point about whether there's any evidence that prospective consumers would actually pronounce it as S-T-O-N-E, stone, there isn't. There's a very small number of questions and answers put to Mr. Jewell. My sense is it's not perfectly clear what he is saying. But in context, the gist of it is everybody dealing with our brand on our side and on our customer's side is pronouncing it this way. I agree that it's not explicit, but in the absence of something going the other way, common sense has got to suggest that that's what he meant and that's how it's pronounced, no? As you say, it's not very clear. I really can't be sure what Mr. Jewell meant. If you lose on that, do we send the case back? No. I think even if you were to look at the marks and overturn the factual determination of the board that S-T-O-N is pronounced stone, I think that the board made a number of other objective, factual determinations about the marks themselves, the placement of the word stone versus stone, the number of syllables in the marks, just looking at the marks themselves, armor and shield, two completely different words. Does the Stonecorp group in its naming of its various products always put the S-T-O-N first or does it sometimes put it at the back end of something? Stonecorp or Armourstone? No, Stonecorp. As far as I know, the marks that they've submitted in opposition were all S-T-O-N using it as a prefix of the mark. And so I assume part of your argument, and this is I guess something the board said in part, that the flipping of the order makes it less likely that there would be confusion because the consuming market knows that when it's coming from the Stonecorp corporation, that source, the stone always comes first. How close did the board get to saying that? I don't know how close they came to saying that. They certainly looked at the marks and found that it was a meaningful distinction where the S-T-O-N was placed within the mark itself. And that was a factual determination. And as were all of the determinations that the board made with respect to the objective comparison between the two marks themselves. Those are factual determinations. They constitute substantial evidence which the board can rest its opinion on. And it should only be overturned if it's arbitrary or capricious. And in this case, opposing counsel hasn't shown anywhere in the record where such a determination is simply arbitrary and capricious. Can I ask you a version of the question I asked your friend on the other side? And just forgive me for not remembering what's in the record. I thought there was some evidence in the record of names of products in this product space from other companies. Third party. Third party, yes. Right. Well, with respect to the similarity of the marks, I don't believe that they... The answer is yes, there was evidence of third party use of some other marks. To the second point, it's not clear that they used that with respect to a determination of likelihood or the similarity of the marks. It's actually not very clear what that was intended to be used for. Did the board rely on that evidence as part of its likelihood of confusion? I guess absence, because I was thinking that if there are a lot of somewhat similar, somewhat descriptive names of products, you kind of want your name of your product to signal something about the content of it. And if there are lots of them, then when a consumer sees two that are different, they are holding everything else aside, somewhat less likely to think, well, they're somewhat similar and therefore they must come from the same source. You're saying if there's... If there are a lot of them. If there's armor and shield and I don't know, there are probably 20 other words that convey protection. And other words, 20 names that convey, I don't know, hardness and somewhat similar to stone. And if there are 50 products out there with names that get close to each other, then the fact that two may be somewhat similar is less likely to cause confusion. I guess that's the question. That evidence is in the record that they presented evidence of third party use. The board confronted that. They presented it with respect, I believe, to a descriptiveness analysis, which the board found that the marks didn't actually form any kind of workable definition that would make armor stone descriptive in some sense. On appeal, they've tried to use the third party use to the sixth factor of the DuPont analysis, which, as we point out in a brief, is usually more applicable to ex-party proceedings. It goes to the strength or weakness of the mark. Here, they've tried to represent the third party use, almost as a kind of generousness argument, that there are third parties out there that use armor stone in some fashion that connotes some kind of workable definition of armor stone for being applicable to epoxies or resins or some such. And they've lost that argument at the board level. They presented that argument in their briefs. They didn't properly plead the generousness argument. And now they've tried to represent that material under the guise of the sixth factor of the DuPont analysis. Can I take you back to the pronunciation issue just very quickly? Assuming we think the board got the pronunciation issue wrong, it seems like they relied very heavily on that to come up with their ruling. And your friend is very worried that that's going to have some kind of effect in other proceedings. Why shouldn't we send them back because it so infects the board's decision to look at it again in terms of putting aside that pronunciation rule? Because the other stuff about placement, syllables, that all seems pretty minor compared to the pronunciation rule. I tend to disagree a little bit. I'm not sure how minor it was. They objectively analyzed the marks and the pronunciation of the marks was one part of the analysis. The placement was also another part. I don't believe they actually made any kind of indication of how much weight they were giving to any kind of factual determination with regards to similarity. Looking at the marks themselves, your second part, how it will harm them, it's certainly one body that looked at their marks and found that they were pronounced as STON. And if that had been something that was meaningful to them, then they were free to take consumer surveys or present some kind of affidavit evidence from prospective consumers on how the mark was actually presented. All they really have is the speculative testimony of their own employee of how STONCOR is pronounced within the corporation. The board looked at that testimony, found it was speculative, and accorded it minimal probative value, which they were perfectly entitled to do. And there was no counter evidence that opposing counsel presented that would contradict that. So with respect to this first DuPont factor, we would submit that the board signings were factually based, supported by substantial evidence, and therefore are accorded maximal weight on appeal and need to be arbitrary or capricious in order to be overturned. I've already somewhat addressed the sixth factor, which they raised, with respect to third-party use. It would be our position that... That was considered neutral, right? Third-party use was considered neutral. That's correct. They looked at the... I think there's some confusion on how the board viewed the third-party marks with respect to third-party use. The way the board determined the arguments presented by opposing counsel were that there were... Opposing counsel's filing of numerous oppositions meant that there were a small number of other similar or substantially the same types of marks being used in commerce. And the board, to that point, found that the filing of the oppositions themselves was not enough to base a conclusion that there was only a small number of marks that were actually being used in commerce with the SPON designation. And that was supported by substantial evidence because there was no evidence other than the oppositions that were filed by opposing counsel that there were other types of marks being used. Does the record indicate whether those oppositions were successful or not? I believe that many of them actually settled. I don't know how many actually came to a decision on the merits. I would have to get back to you on that. I'm not sure. And to the final point of merely descriptiveness, the board found that to be merely descriptive, the marks need to immediately and unequivocally describe the purpose and function of the goods. And in this case, there was nothing of record submitted that would indicate that armor stone was unequivocally and immediately indicative of epoxies and resins used to fill concrete floors. To your honest point, with respect to the merely descriptiveness of stone shield or stone heart, it would be our position that armor stone is more suggestive of qualities such as strength or durability, but that there's really no evidence of record to show that it is immediately and unequivocally descriptive. Is stone part of the product? I believe stone is an ingredient part of the product. Boy, that's awful tough to get around, isn't it? You've got stone in your stone-appearing product and you call it a stone and it's not descriptive? Remember, we're trying to make sure that anybody who uses a similar product can use words in the public domain to describe their product as well Wouldn't they want to say we've got stone in our product too? They could. I don't see any reason for that. Sounds descriptive, but I do know what the board said. It's a part of the product. It's not the product. The product itself isn't stone. It's a liquid. It's not a solid. I understand. So it's an epoxy, a resin, it's a coating. So you might have a little bit more problem if your product was called liquid stone. I think we'd have a significant more of a problem if the product was called liquid stone. That's absolutely correct. But here it's not. It's fortunately called armor stone. So the board, without evidence to the contrary, found that it was not merely descriptive. The case that they cite, the ABCOR development case, actually found that the mark there was merely descriptive, but the mark there was gas badge, which, as you might surmise, was actually a badge used to measure gas. It is those types of marks that are normally found merely descriptive, where the mark, there's not much guesswork being done as to what kind of product the mark is actually used to describe. Thank you, Mr. Seifert. Thank you. Mr. Quinn, we restored your five minutes to rebuttal if you need to use it. Thank you, Your Honor. I want to get right to the question Judge Taranto asked. I hope I pronounced your name correctly. Pronunciation is important. It is certainly important. Regarding the evidence of third-party use, the board said, and I quote, The record is devoid of any evidence regarding uses of similar marks for similar goods. You'll find that at page 1411 of the appendix. That is flat-out wrong. They said no evidence. Our trial brief had seven pages of references. You'll find those at page 1040 and 1047 through 1053. Forty pages of exhibits. I'm sorry, 1411 does not appear in here. That's in their decision. You said 1411. That's not a joint appendix number? It is a joint appendix number. It should be to the board's decision. It's attached to this, but it's not in the actual appendix. I'm sorry. No, that's fine. I got it. The quote is, is devoid of any evidence regarding use of similar marks for similar goods. Our brief included seven pages of references to 40 pages of exhibits. Those exhibits appear at A214 through A265 and show 19 third-parties. 19 using the mark armor stone in connection with construction stone, concrete, or epoxy products. For specialty coatings to say that there was no other use or no evidence of use of the armor stone mark by third parties is flat-out wrong. Now, Judge Rader, you had asked about testimony. My colleague, Mr. DiGuglielmo, pointed out that in addition to the pages that I cite or that you cited, there's further testimony by Mr. Jewell on A285 and 286 on the issue of this pronunciation. So there is more evidence on that. Thank you. I also want to point out that on the third-party- Can I ask you, I see where you pointed to that, and I think you're right. There's a lot of usage of armor stone by somebody other than that. How does that increase the likelihood of confusion between your mark and armor stone? Doesn't that just create a likelihood of confusion between armor stone and other armor stone marks? No, Your Honor. It goes directly to DuPont Factor VI, and Judge Markey, when he wrote the DuPont case years ago, said, all evidence must be considered. All evidence must be considered. Some given more weight, some less. The DuPont factor is to consider confusion between your mark and their mark. Pardon me? But it's to consider whether there's confusion between your mark and their mark. Why does the fact that a bunch of other parties use armor stone confuse your mark with their mark? First of all, if there is confusion of our mark with their mark and they are using those marks, we'll deal with them when we finish with this proceeding. Secondly, the significance of DuPont Factor VI is to show, with respect to the challenge mark, namely the specialty coatings mark, that it really isn't very distinctive, because all these other folks out there are using the same mark on similar goods. So that's a factor that should be considered in the course of this. But if it's not very distinctive, why would anybody confuse it with your mark? Pardon me? If it's not very distinctive, why would anybody... It is a factor to be... It sounds like it weighs against you, though. Pardon me? It sounds like it weighs against you. In terms of the overall balancing of the DuPont factors, it's a factor that weighs in our favor because it shows weakness of their mark. And that's something that Judge Markey said. You've got to take account of all of the evidence. I think I know the answer to this, but just to be clear, your evidence of third-party use is evidence of third-party use of Armourstone, either with a U or with not a U, but not evidence of third-party use of other names... Correct. ...that are in the general space of Stone Shield and Armourstone. Absolutely correct. Nineteen parties using Armourstone. One other point I wanted to make, a clarification for Judge Rader, about our client's product and the question about Stone and Shield and whether there is any stone or whether it looks like stone. Our client's product, first of all, doesn't contain any stone. It does not contain any stone. Does it look like stone when it's laid out? No, it does not look like stone. It is a smooth, poured-in-place flooring that is colored, according to whatever pigments are put into it, but it certainly doesn't look like a stone floor. Thank you, Mr. Quinn. It is a smooth floor. When you walk into any airport in this country and you walk on that smooth floor that may be colored or may be not, chances are eight out of ten... Does it have any stone in it? Pardon me? Does it have any stone in it? No. Okay, thank you. There is no stone in it. It is epoxy and hardener and dye. Thank you. Thank you very much. Thank you, Mr. Quinn.